UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

RITA C. HALEY,           )
                            )
      Plaintiff,       )
                            )
v.                        )       No. 1:11-cv-265
                            )       *Lee*
DR. SOBROTO KUNDU, Individually and   )
d/b/a Neurology and Neurodiagnostics, *et al.*,  )
                            )
      Defendants.      )

## <u>MEMORANDUM AND ORDER</u>

Before the Court is a motion for judgment as a matter of law or, in the alternative, for a new trial or juror communication [Doc. 135] filed by Plaintiff Rita Haley. Defendant Dr. Sobroto (apparently correctly spelled "Subroto") Kundu ("Defendant Kundu") and *pro se* Defendant Roma Trakru ("Defendant Trakru") have both filed responses to the motion [Docs. 148, 149, 152 & 153] and Plaintiff replied to Defendant Kundu's response [Doc. 155]. For the reasons explained below, Plaintiff's motion [Doc. 135] will be **DENIED**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff filed the instant lawsuit on September 16, 2011, alleging claims for unpaid overtime pursuant to the Fair Labor Standards Act ("FLSA") and retaliatory discharge for asserting her rights under the FLSA [Doc. 1 at PageID# 3-4]. She asserted claims against both Defendants individually and doing business as Neurology and Neurodiagnostics [*id.* at PageID# 1]. Plaintiff alleged that she was hired as an "office manager" but instead performed clerical tasks and routinely worked more than 40 hours a week, but was denied overtime pay; after she complained about the lack of overtime pay, Plaintiff was terminated and was told her job was

being eliminated [*id.* at PageID# 3]. Plaintiff alleged Defendants engaged in a pattern and practice of violating the FLSA, hired employees who worked off the clock and would terminate them after they worked for free, and made derogatory comments about American employees [*id.*]. Plaintiff sought reinstatement or front pay and benefits in lieu of reinstatement, all wages and compensation due, back pay, damages for humiliation, embarrassment, and emotional distress, punitive damages, attorneys' fees and expenses, and prejudgment interest [*id.* at PageID# 4]. Defendants, who were originally represented by the same attorney, alleged in their initial answer that Plaintiff was exempt from FLSA overtime requirements [Doc. 8].

Following consent to the undersigned, a Scheduling Order governing this case was filed on February 28, 2012 [Docs. 1, 12 & 17]. The Scheduling Order set forth a deadline to amend pleadings of January 8, 2013, a discovery deadline of February 5, 2013, and a trial date of May 7, 2013 [Doc. 17]. Plaintiff timely moved to amend and subsequently filed an amended complaint [Docs. 19, 20 & 21] which contained substantially the same allegations but modified the name of Defendant Roma Kundu to Roma Trackru (actually spelled "Trakru") a/k/a Roma Kundu and clarified her relationship with Defendant Dr. Kundu. Defendants filed a joint answer to the amended complaint denying Defendant Trakru's liability, alleging again that Plaintiff was exempt from FLSA overtime requirements, and asserting Plaintiff was not fired for making complaints about overtime [Doc. 32].

The case proceeded through discovery and no dispositive motions were filed by any party. A final pre-trial conference was set for April 15, 2013 [Doc. 45]. On April 11, 2013, the Thursday preceding the final pre-trial conference, Defendant Trakru filed a motion indicating a desire to dismiss her attorney and represent herself [Doc. 52]. It was represented that each

2

Defendant had different attorneys for much of the case (indeed, since February 2012), but this had not been reflected in the docket because no motions to withdraw had ever been filed. Defendant Trakru's motion was granted, and Defendant Trakru proceeded to trial *pro se* [Doc. 57]. Although Defendant Trakru moved unsuccessfully to continue the trial and for recusal, the trial began on its originally scheduled trial date of May 7, 2013 and proceeded through May 14, 2013, at which time the case was submitted to the jury [Docs. 60, 79, 85, 87, 88, 89, 91, 111, 115, 120, 126, 131 & 132].

Due to the fact that many questions of law had not been addressed before trial by way of dispositive motion, many Rule 50 motions were made during trial and were ruled on in various forms. The Court ruled on two Rule 50 motions in a written order during trial, denying Defendant Kundu's motion that Plaintiff had not made a proper complaint pursuant to the FLSA, and granting Plaintiff's motion with respect to the "executive employee" exemption advanced at trial by Defendant Trakru [Doc. 127]. Other Rule 50 motions were ruled on from the bench. After Plaintiff's proof, Defendant Kundu raised a motion that Plaintiff had not produced evidence in support of either claim because there was no meeting of the minds on payment and neither Defendant retaliated against Plaintiff, which was denied. At this time, Plaintiff made a motion that Defendant Trakru qualified as an "employer" and a "person" under the FLSA; the Court reserved ruling on the motion, but when it was renewed at the close of proof, the motion was granted and the Court determined as a matter of law that Defendant Trakru was an "employer" and a "person" under the FLSA. At the close of proof, Plaintiff also raised motions contesting the validity of the "fluctuating workweek" issue and the "administrative employee" exemption, which were denied. In the context of the "fluctuating workweek" issue, Plaintiff essentially also made a

3

motion seeking a ruling that she had worked overtime, which was denied.

Therefore, at the time the case was submitted to the jury, Defendant Trakru was an "employer" and a "person" for FLSA overtime and retaliation purposes and the "executive employee" exemption was no longer at issue, although whether Plaintiff qualified for the "administrative employee" exemption remained for jury determination. The jury was also instructed on the "fluctuating workweek" theory, which speaks to damages for overtime if an employee is not exempt from the FLSA overtime requirements but worked a certain type of fluctuating schedule. Finally, whether Plaintiff had worked overtime, and whether she had engaged in protected activity, were both still issues for the jury to determine.

The jury returned a verdict on May 14, 2013. On the verdict form, the jury found for Defendants and determined Plaintiff was exempt from FLSA requirements [Doc. 133]. The jury also found that Plaintiff had not established that she engaged in protected activity, which resulted in a finding for Defendants on Plaintiff's FLSA retaliation claim [Doc. 133]. A judgment was entered in favor of Defendants on May 14, 2013 [Doc. 134]. Plaintiff filed her timely motion on June 10, 2013 [Doc. 135].

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 50 states, in relevant part, as follows:

> (b)    Renewing the Motion After Trial; Alternative Motion for a New Trial. If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment – or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged – the movant may file a renewed motion for judgment as a matter of law and may include an alternative

4

or joint request for a new trial under Rule 59.  In ruling on the renewed motion, the court may:

> (1)    allow judgment on the verdict, if the jury returned a verdict;
> (2)    order a new trial; or
> (3)    direct the entry of judgment as a matter of law.

Fed. R. Civ. P. 50(b).

Rule 59 states in part:

> (a)    In General.
>
> (1)    Grounds for New Trial.  The court may, on motion, grant a new trial on all or some of the issues – and to any party – as follows:
>
> (A)    after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court;
>
> . . .
>
> (b)    Time to File a Motion for a New Trial.  A motion for a new trial must be filed no later than 28 days after the entry of judgment.

Fed. R. Civ. P. 59.

Generally, "[j]udgment as a matter of law is appropriate when 'viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party.'" *Tisdale v. Fed. Exp. Corp.*, 415 F.3d 516, 527 (6th Cir. 2005) (quoting *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004)).  The United States Court of Appeals for the Sixth Circuit has determined that "[i]n a federal question case, the standard of review for a Rule 50 motion based on sufficiency of the evidence . . . [is that] [t]he evidence should not be weighed, and the credibility of

5

the witnesses should not be questioned. The judgment of this court should not be substituted for that of the jury; instead, the evidence should be viewed in the light most favorable to the party against whom the motion is made, and that party given the benefit of all reasonable inferences." *Id.* at 531; *see also Williams v. Nashville Network*, 132 F.3d 1123, 1130-31 (6th Cir. 1997).

As for a motion pursuant to Fed. R. Civ. P. 59, the Sixth Circuit has noted:

> A court may set aside a verdict and grant a new trial when it is of the opinion that the verdict is against the clear weight of the evidence; however, new trials are not to be granted on the grounds that the verdict was against the weight of the evidence unless that verdict was unreasonable. Thus, if a reasonable juror could reach the challenged verdict, a new trial is improper. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.

*Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 820-21 (6th Cir. 2000) (citations and internal quotations omitted). Thus, a jury's verdict should not be discarded merely because different inferences and conclusions could have been drawn from the evidence or even because another result appears more reasonable. *Nolan v. Memphis City Schools*, 589 F.3d 257, 264 (6th Cir. 2009).

## III. ANALYSIS

### A. Exemption

Plaintiff first argues that Defendants had the burden of showing Plaintiff fit within the administrative exemption, which is narrowly construed, and no reasonable jury could have found that Defendants met this burden because the proof established Plaintiff's duties were primarily clerical and therefore non-exempt [Doc. 136 at PageID# 1184]. Based on the applicable provisions in the Code of Federal Regulations, Plaintiff argues that her decision-making ability

6

was too limited to warrant the application of this exemption because she did not exercise discretion and independent judgment on matters of significance [*id.* at PageID# 1184-86]. Plaintiff contends that any recruiting work she performed was non-exempt; that her insurance claim work was non-exempt because it did not involve determinations regarding liability or negotiations; delivering brochures to advertise the practice was non-exempt work because it was general marketing and not targeted selling efforts; and her work with patients was non-exempt [*id.* at PageID# 1186-88]. Plaintiff asserts that the bare application of skill does not equal discretion and independent judgment based on a Department of Labor opinion letter concerning the exempt status of paralegals, and she alleges that she was performing secretarial and clerical work that involved the application of skill, but not discretion and independent judgment [*id.* at PageID# 1188]. Plaintiff finally argues that many of the factors to consider in addressing the "administrative employee" exemption are factors to consider when addressing the "executive employee" exemption and, because the Court determined there were not enough employees to warrant the latter, any supervisory duties Plaintiff performed (such as double-checking Tish Capps' time sheet) are not the focal point of the "administrative employee" exemption and it was not her primary duty, such that these activities are not relevant to the exemption [*id.* at PageID# 1189].

Defendant Kundu, now represented by new counsel who was not present for the trial, appears to claim that Plaintiff cannot raise this as a ground for judgment as a matter of law because Plaintiff did not seek a ruling on this issue during trial [Doc. 149 at PageID# 1311].[1] Defendant Kundu further argues that although Plaintiff contends Defendants were impeached during trial, the clear weight of the evidence established that Plaintiff had been an office manager at a doctor's

---

[1] This is incorrect, as Plaintiff did assert a Rule 50 motion on the "administrative employee" exemption during trial.

office previously for 10 years, she held herself out to third parties as Defendant Kundu's office manager, had business cards printed with that title, and described her job duties as an "office manager" on a post-discharge resume [*id.* at PageID# 1311-12]. Defendant Kundu argues there was sufficient evidence to create a jury question on the issue of whether Plaintiff was an "administrative employee," the jury verdict did not conflict with the great weight of the evidence, and the verdict could reasonably be rendered by the jury; therefore, judgment as a matter of law or a new trial would be inappropriate [*id.* at PageID# 1312].

Defendant Trakru argues in response that there was ample evidence from which the jury could have concluded Plaintiff was exempt; as some examples, Defendant Trakru notes that Plaintiff's salary was higher than that of non-exempt employees, she had a daily meeting with Defendant Kundu, she kept her own time, she ordered business cards holding herself out as "office manager," she approved overtime of other employees, she signed timesheets for other employees, she placed ads in the paper seeking to hire additional staff, and her essential duties were managerial [Doc. 153 at PageID# 1324-25]. As such, Defendant Trakru contends a reasonable jury could have found for Defendants on the exemption issue [*id.* at PageID# 1325]. Defendant Trakru further argues Plaintiff cannot rely on new evidence (in the form of Department of Labor opinions) to make her new arguments and further contends that Plaintiff's dissatisfaction with the jury's credibility determination is not a valid basis for a new trial [*id.* at PageID# 1326].

As noted above, "[a] court may grant judgment as a matter of law only when there is a complete absence of fact to support the verdict and may grant a new trial only when a jury has reached a seriously erroneous result." *Henry v. Quicken Loans, Inc.*, 698 F.3d 897, 899 (6th Cir. 2012) (citation and internal quotations omitted). In *Henry*, the Sixth Circuit was similarly faced

with a motion for judgment as a matter of law or new trial on an FLSA exemption issue and noted the jury had reached a reasonable finding of fact when it found the plaintiffs were exempt after weighing conflicting testimony as to the facts surrounding their job duties. *Id.* at 900-01.

In this case, the conflicting testimony and evidence presented at trial established an intensely factual question as to whether Plaintiff's work duties were exempt or non-exempt. There was evidence presented primarily by the testimony of Plaintiff and Tammy Gribble (and also through a some documents) that Plaintiff answered phones; did data entry; greeted patients; did not supervise other employees; had no authority or input on hiring or firing employees; had to ask either Defendant for approval when other employees requested time off or she requested time off; did not perform any payroll tasks; tried to but was unsuccessful in implementing an office manual; was not heavily involved in processing insurance claims; visited other doctor's offices two or three times to give them a brochure/pamphlet about Defendant Kundu's practice; did not have an office to work in; and was supervised and instructed by Defendant Trakru, who functioned as the true office manager [Pl.'s Exs. 35, 40; Defs.' Exs. 110, 112, 113, 114, 115, 131, 132, 134].[2] There was also evidence presented by documents and the testimony of both Defendants, however, that Plaintiff had previous lengthy work experience as an office manager at a doctor's office; was hired as an office manager by Defendants; was paid more than the other office employees who were doing primarily clerical work; had her own office to work in; ordered business cards stating her title as office manager; represented herself as office manager to various individuals, including the other doctor's offices while doing marketing activities; gave one employee a warning about her

_____

[2] Some of these are duplicates, as both Plaintiff and Defendants admitted some of the same e-mails into evidence. All exhibits referenced in this Order with the term "Ex." or "Exs." are the exhibits admitted at trial that were supplied to the jury.

work; scheduled other employees and sent in their time sheets; put an advertisement in the paper seeking job applicants and collected those resumes to send to Defendants; did not have to turn in time sheets for her own time to Defendants; met daily with Defendant Kundu to go over the events of the day; and represented herself as the office manager on her resume after being discharged [Pl.'s Exs. 1, 2, 4, 13, 14, 15, 16, 24, 33, 35, 39; Defs.' Exs. 106, 111, 114, 115, 116, 117, 124, 130, 131, 132, 134, 135, 136, 137, 138, 139, 140, 141, 142].[3]

The jury was instructed extensively on the Code of Federal Regulations provisions applicable to the "administrative employee" exemption and, in fact, the parties agreed to include the entire provision found at 29 C.F.R. § 541.202 in the jury instructions, which provided factors for the jury to consider in determining whether the employee exercised discretion and independent judgment. The jury was also instructed on other terms found in the elements of the exemption, such as "primary duty" and "work directly related to management or general business operations," was instructed that an individual's job title alone was not determinative of the exemption, and was further instructed that exemptions were to be narrowly construed. *See* 29 C.F.R. § 541.200; 29 C.F.R. § 541.700; 29 C.F.R. § 541.201(a)-(c); 29 C.F.R. § 541.2; *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960); *Schaefer v. Indiana Michigan Power Co.*, 358 F.3d 394, 399-400 (6th Cir. 2004). The jury was also instructed that Defendants had the burden to prove by a preponderance of the evidence that Plaintiff fell within the parameters of the exemption.

Thus, the jury had a wealth of guidance and context within which to weigh the conflicting testimony on the exemption issue. The evidence that Plaintiff was not exempt came primarily through the testimony of Plaintiff and Tammy Gribble, while much of the documentary evidence

---

[3] Again, some of these documents are duplicates.

10

provided more support for the proposition that Plaintiff was performing more managerial tasks and was exempt. Therefore, the jury had to make credibility determinations as they weighed the evidence, and it appears the jury gave more weight to the documents and testimony presented by Defendants as to Plaintiff's job duties, instead of crediting Plaintiff's testimony and the testimony of Tammy Gribble that Plaintiff was performing mainly clerical, non-exempt work.

As there was conflicting evidence, the Court could not make a determination on Plaintiff's Rule 50 motion on this exemption issue during trial, *i.e.*, it was not apparent from the evidence presented that the exemption issue could be determined as a matter of law. Likewise, at this juncture, the clear weight of the evidence does not work in favor of one outcome or the other. Instead, upon review of the documentary evidence, reflection on the testimony heard during trial, and the jury's determination as to what witnesses were more credible than others, the jury reasonably could have reached either conclusion. Thus, the Court cannot determine the jury's verdict was contrary to law or the weight of the evidence on this issue. The Court will not reweigh the evidence or make its own credibility determination when a reasonable jury could have reached either conclusion; therefore, judgment as a matter of law or a new trial would be inappropriate.

### B. Protected Activity/Retaliation

Plaintiff next argues that no reasonable jury could have found Plaintiff did not engage in protected activity because, although Defendants presented many theories for the reason Plaintiff no longer works for them, the underlying admission was that if Plaintiff had not objected to being paid a salary, she would still have a job with them [Doc. 136 at PageID# 1189-90]. Plaintiff alleges this admission is direct evidence of retaliation and shows that Plaintiff engaged in

11

protected activity because she specifically mentioned overtime and her objections to being paid a salary, and asked Defendants to make corrections [*id.* at PageID# 1190]. Plaintiff contends that given these communications, a reasonable jury could not have concluded she failed to engage in protected activity [*id.* at PageID# 1190-91]. If Plaintiff did indeed engage in protected activity, Plaintiff asserts Defendants admitted they retaliated against her; as such, Plaintiff argues judgment as a matter of law or a new trial would be appropriate [*id.* at PageID# 1191].

Defendant Kundu does not respond to this argument specifically, although he appears to hold the same belief that Plaintiff did not raise this as an issue for Rule 50 adjudication during trial and thus cannot raise it now; he also generally states that the parties seemingly agreed this was another jury issue and the resulting verdict did not conflict strongly with the weight of the evidence [Doc. 149 at PageID# 1312].

Defendant Trakru alleges there was inadequate evidence from which the jury could have found Plaintiff engaged in protected activity because Defendants did not believe the e-mails referenced rose to the level of protected activity and there was conflicting evidence on the statements made during the final meeting between Plaintiff and Defendant Trakru [*id.* at PageID# 1325]. Defendant Trakru asserts the jury weighed all the testimony and evidence and concluded that Plaintiff did not engage in protected activity, and the evidence did not compel the jury to reach an alternate conclusion [*id.*]. Defendant Trakru contends that Plaintiff's arguments are based primarily on the jury's credibility determinations, but this is not a valid argument for a new trial [*id.* at PageID# 1326].

The jury's verdict form included two questions with respect to establishing the elements of Plaintiff's FLSA retaliation claim: the first asked whether Plaintiff had proved by a preponderance

of the evidence that she had engaged in protected activity, while the second asked if Plaintiff had proved by a preponderance of the evidence that there was a causal connection between her protected activity and her termination.   After the jury had indicated earlier in the verdict form that Defendants established Plaintiff was exempt, they were then directed from that question to the first question under the heading "Retaliation Claim."   If the answer to the first question on retaliation was yes, the jury was directed to proceed to the second (and, if the answer to the second question was yes, further on from there to questions concerning damages).   If the answer to the first question was no, the jury's deliberations were complete.   The jury answered no, finding Plaintiff had not established she engaged in protected activity.

Although Plaintiff claims the weight of the evidence is solely in favor of finding Plaintiff engaged in protected activity, once again, there is evidence on both sides of this question and the jury had to weigh conflicting testimonial and documentary evidence.   To establish some background on this issue, which relates to Plaintiff's pay, there is an e-mail from Plaintiff to Defendant Kundu in July 2010 by which Plaintiff purported to accept the position of office manager at a pay rate of $23 per hour [Pl.'s Ex. 1].   Testimony at trial indicated this was more of a proposal by Plaintiff, and following that exchange were e-mails between Plaintiff and Defendant Trakru in August 2010 involving some negotiations about pay and benefits.   Defendant Trakru initially wrote that the highest salary bracket she would consider was $40,000 per year, but Plaintiff could potentially start on a contract basis at $25 per hour for 10-15 hours a week; in response, Plaintiff stated she would accept $20 per hour but was not looking to start as a contract employee and instead wanted to work full time as the office manager; Defendant Trakru next invited Plaintiff to come to the office to meet with both Defendants [Pl.'s Exs. 2, 39].   Plaintiff

testified that during lunch with Defendant Trakru, she expressed concerns about not being paid overtime and told her she did not want to be paid a salary; Plaintiff further testified that following this exchange of e-mails, she and Defendant Kundu had a "handshake deal" for $20 per hour for 40 hours a week, and that was the last discussion about pay.

There is no further documentary evidence of anything related to Plaintiff's pay until two e-mails from Defendant Trakru to Plaintiff on December 1, 2010; one sets out Plaintiff's payroll amount with gross and net amounts and the other sets out Tish Capps' summary payroll with her hours worked and paychecks received for the past several months [Pl.'s Exs. 22, 23]. There is nothing distinctive about these e-mails to indicate Plaintiff was paid a salary besides the fact that the e-mails look very different. On December 2, 2010, Plaintiff texted Defendant Trakru that she had received her "pay check stub" and thought she was being overpaid [Defs.' Ex. 108]. Defendant Trakru responded on December 6, 2010 with a file attached and stated she had calculated Plaintiff's monthly pay to be $2668.50 and that Plaintiff had inadvertently already been paid for December [Defs.' Ex. 200].

The next discussion about pay evidenced in the documents began on January 13, 2011, when Defendant Trakru e-mailed what appears to be an individual who was going to process the medical office's payroll and issue payroll checks. The e-mail also went to Plaintiff and Defendant Kundu and listed hours worked and pay rate for Tish Capps and noted Plaintiff's salary amount for the next paycheck [Pl.'s Ex. 25; Defs.' Ex. 115]. Late that evening, Plaintiff e-mailed Defendant Kundu to tell him she would be leaving early the next day, to which he responded with some concerns, and Plaintiff replied the morning of January 14 stating she would stay the whole day; Plaintiff further asked Defendant Kundu how many hours they had paid her for and stated her

14

pay rate was $20 per hour [Defs.' Exs. 116, 117, 118].   In the afternoon on January 14, Plaintiff

responded to Defendant Trakru's e-mail to the payroll processor and stated that she never agreed to

a salary position and they had agreed on 40 hours per week at $20 per hour; she further stated "I

would prefer that you make corrections" [Pl.'s Ex. 5; Defs.' Ex. 119].   This began a longer, more

detailed string of e-mails.   Shortly after receiving Plaintiff's e-mail the afternoon of January 14,

Defendant Trakru responded to Plaintiff and stated they had agreed on a salary, this was a sudden

change in her mind, and she suspected it may have been because Plaintiff was unable to leave early

that day [Pl.'s Ex. 6; Defs.' Ex. 120].   On January 20, 2011, Plaintiff responded, stated she did not

have pay check stubs for the checks she had received, she had previously asked Defendant Trakru

for clarification about her pay, and she was not receiving $20 per hour; Plaintiff further stated

"[w]e both know that I have been putting in over time every day just to keep up. . ." and reiterated

her position that she accepted Defendant Kundu's offer of $20 per hour and was concerned about

Defendant Trakru's e-mail to the payroll processor [Pl.'s Ex. 6; Defs.' Ex. 121].   Plaintiff asked to

sit down with Defendants to discuss this issue, but Defendant Trakru did not respond until January

27 to suggest a meeting time the following day, which was the date of Plaintiff's termination [Pl.'s

Ex. 6; Defs.' Exs. 122, 123].   Also in the documentary evidence are pay stubs for October,

November, December, and January which list Plaintiff's annual salary at $40,000 or note that she

was paid a salary [Pl.'s Exs. 17, 18, 19, 20; Defs.' Exs. 126, 127, 128, 201].

    In addition to the documentary evidence, there was extensive conflicting testimony.

Plaintiff testified that she never agreed to be paid a salary; that Defendant Trakru told her to keep

her own timesheets because they trusted her; that she never received a pay stub with her checks;

that things had changed at the office after January 20, when Plaintiff sent her more detailed e-mail

to Defendant Trakru; and that she had no plans to quit her job in those last few weeks. Plaintiff testified that she had not calculated her pay to see if the paychecks matched up to her hours worked and she did not realize she was being cheated until January 14 and that before then she believed Defendants were having money problems and would correct the mistakes with her pay at some point. Plaintiff also testified that she had verbally asked Defendant Trakru multiple times for clarification on her pay prior to the January 14 e-mails and beginning after her second paycheck.

In contrast, Defendant Trakru testified that she was surprised Plaintiff did not think she was working for a salary; that she never kept time for Plaintiff; that she never collected timesheets from Plaintiff and did not know why Plaintiff was keeping her time; and that she believed Plaintiff quit because she and Plaintiff essentially had a disagreement about pay and Plaintiff decided she did not want to work for the money offered her. Defendant Trakru testified that after Plaintiff was unable to leave early on January 14, she began taking her personal belongings home and withdrew from the job. Defendant Kundu testified he never agreed to an hourly pay rate for Plaintiff, told her it did not make sense for an office manager, and he had never heard of any issues with Plaintiff's pay rate until January 14, after which there was a change in Plaintiff's demeanor as she became more distant and was unresponsive to the needs of the office. Defendant Kundu testified he was certain he gave Plaintiff the majority, if not all, of the pay stubs with her checks because that was his usual practice and either he or Defendant Trakru would have done so.

The jury was instructed that protected activity included an employee's formal or informal complaints of FLSA violations and the activity had to be sufficiently clear to be understood as an assertion of rights protected by the FLSA, but need not reference the FLSA by name. Based on the testimony and the documentary evidence, there is evidence by which the jury could have

16

determined Plaintiff was not engaging in protected activity because she was not complaining about unpaid earned overtime or violations of the FLSA; instead, there is evidence to support the proposition that Plaintiff understood she was being paid a salary from the beginning of her employment and was making complaints to Defendants merely because she was unhappy with her salary. For example, there are multiple pay stubs in the record beginning in October 2010 which state Plaintiff's annual salary was $40,000. Defendant Kundu testified he was sure he gave Plaintiff most, if not all, of these pay stubs and it was his normal practice to give out pay stubs with paychecks. If the jury credited Defendant Kundu's testimony that he gave Plaintiff her pay stubs over Plaintiff's testimony that she did not receive pay stubs and believed she was being paid hourly, the jury might have concluded Plaintiff knew she was exempt and salaried all along and did not honestly think she was entitled to overtime pay.

There was also testimony from Plaintiff that she was confused about her pay starting from her first paycheck, but never calculated what her pay should have been for each pay period based on her hours worked, even though she was keeping a contemporaneous calendar with her hours each day of work. There was also testimony that Plaintiff was not turning in any timesheets to Defendants with her weekly hours, and that she did not raise any issues about her pay with Defendants until January 14. Defendants testified they believed Plaintiff's attitude changed after she was unable to leave early that day, and she had moved her personal belongings out of the office at some point in January. Given the timing of the e-mails on January 13 and 14, the jury might have inferred from this testimony that Plaintiff knew she was salaried but was unhappy with her pay, was planning to quit her job, and had some other basis for making complaints other than a belief she was entitled to overtime pay. Essentially, there is evidence from which the jury could

17

infer Plaintiff did not have a sincerely held or reasonable belief that she was entitled to overtime pay and she, therefore, could not have been asserting a complaint about FLSA violations.  *See Jones v. Hamic*, 875 F. Supp. 2d 1334, 1353-54 (M.D. Ala. 2012) (noting that "[w]hen a plaintiff does in fact complain of a FLSA violation, she must have a good faith, objectively reasonable belief that the complained of practice violated the statute" and observing that the exempt plaintiff "could not have objectively believed [the defendant] owed her overtime wages when she complained. . .").

The Court does not pretend to know how the jury reached its conclusion; at this juncture, the Court can only review the testimony and the evidence submitted to the jury to determine if a reasonable jury could have reached the conclusion this jury reached in this case.  Given the conflicting evidence presented to the jury about Plaintiff's pay and the necessity of making credibility determinations as to witness testimony, the Court cannot conclude the jury's verdict was against the great weight of the evidence.   Given the jury's conclusion on the exemption issue, in conjunction with their conclusion on this issue, it appears the jury did not find Plaintiff's testimony credible and did not believe she was asserting her rights in good faith under the FLSA when she sent the e-mails to Defendant Trakru referencing her pay rate and overtime.  Plaintiff contends Defendants' incredibility is established due to their shifting reasons on various issues, but the jury heard many of Defendants' conflicting theories on issues such as Plaintiff's termination, who managed her, whether Defendant Trakru was managing the office, whether Plaintiff's performance had anything to do with her termination, and whether she was given another offer at that time – and still, it seems, found Plaintiff to be far less credible.  That credibility determination was the province of the jury, and the Court will not find fault with it now.

18

Although the evidence of Plaintiff's e-mails to Defendant Trakru provides support for finding Plaintiff engaged in protected activity, this alternative conclusion rests heavily on the jury finding Plaintiff credible in the sense that she held an honest belief she was being paid hourly and was entitled to overtime, while the documentary evidence provides support that Plaintiff always knew she was being paid a salary, knew she was not entitled to overtime pay, and made these complaints to Defendants for other reasons perhaps related to her dissatisfaction with her salary and plans to leave her job. There is sufficient evidence on both sides of the issue to find that a reasonable jury could have reached the conclusion the jury reached in this case, and the Court cannot reweigh the evidence or the jury's credibility determinations to grant Plaintiff the requested relief on this issue.

C.     Vicarious Liability

Finally, Plaintiff argues that it was error to fail to include Plaintiff's proposed jury instruction as to vicarious liability [Doc. 136 at PageID# 1191]. Plaintiff contends the Court erred in choosing to determine that issue and erred in only distinguishing between Defendants on the verdict form as it pertained to punitive damages because the jury almost immediately asked a question about ruling on the Defendants separately [*id.*]. Plaintiff argues the jury was clearly confused as to the liability of the two Defendants, but it is clear that Defendant Kundu would have been liable for the actions of Defendant Trakru that he authorized [*id.* at PageID# 1191-92]. Plaintiff speculates that jury confusion as to the liability of these Defendants may explain the result in the case and that result could be contrary to law [*id.* at PageID# 1192]. Plaintiff alternatively argues that if the Court does not have sufficient information to rule on the vicarious liability issue as a matter of law or in the context of granting a new trial, Plaintiff should be allowed to interview

19

the jurors pursuant to E.D. Tenn. L.R. 48.1 to determine the basis for their verdict [*id.*]. Plaintiff has attached a proposed questionnaire to her motion [Doc. 135-1].

Defendant Kundu argues that the vicarious liability instruction requested by Plaintiff was unnecessary because Defendant Kundu admitted that he was responsible for Defendant Trakru's actions during trial, conceding vicarious liability [Doc. 149 at PageID# 1312-13]. He further argues the Defendants submitted a proposed verdict form which separated questions as to liability for each Defendant, and Plaintiff now seems to favor such form [*id.* at PageID# 1313]. Defendant Kundu contends that because the jury found Plaintiff did not engage in protected activity, it is speculation that the jury would have entered a judgment against one Defendant and not the other if given the vicarious liability instruction [*id.*]. Defendant Kundu finally opposes the request to interview the jurors, noting it would be intrusive and confusing and the questionnaire could create additional claimed errors where no errors exist [*id.* at PageID# 1313-14].

Defendant Trakru argues Plaintiff has no grounds to speculate with respect to the impetus of the jury's verdict and there is no basis for her belief the verdict would have been different if the jury had been instructed on vicarious liability [Doc. 153 at PageID# 1327]. Defendant Trakru asserts it is not for the Court to second guess the jury, Defendant Kundu conceded to vicarious liability, and Plaintiff won on her Rule 50 motions with respect to Defendant Trakru being an "employer" and a "person" for FLSA purposes; however, the vicarious liability question would only be relevant if the jury had ruled against Defendants [*id.* at PageID# 1327-28]. As the jury determined Plaintiff was exempt (and, therefore, Defendants were not liable), assignment of liability is moot and would have no impact on the outcome [*id.* at PageID# 1328]. Moreover, Defendant Trakru argues vicarious liability is not a fact issue and the jury's question was simply a

20

procedural one to determine if they needed to fill out verdict forms separately for each Defendant [*id.* at PageID# 1328-29]. Finally, Defendant Trakru opposes Plaintiff's request for jury communication [*id.* at PageID# 1329].

Plaintiff submitted a jury instruction on the topic of vicarious liability twice, which the Court considered [Doc. 49 at PageID# 282; Doc. 124]. During the trial, the Court made rulings on Defendant Trakru's classification as an "employer" and a "person" under the FLSA, which resulted from testimony from Defendant Trakru about her role at the office and Defendant Kundu's admission that Defendant Trakru had authority to make employment decisions at the medical office. Because of these rulings, the Court determined that a vicarious liability jury instruction would be unnecessary and further suggested it could determine vicarious liability as a matter of law post-verdict given its ruling that Defedant Trakru was both an "employer" and a "person" under the FLSA. Significantly, **Plaintiff** agreed to this course of action. To that end, the Court grouped Defendants together on almost all questions on the verdict form, separating Defendants out only to ask whether punitive damages should be awarded against each individual Defendant. Essentially, therefore, with the Court's ruling that Defendant Trakru was an "employer" for FLSA purposes and a "person" for FLSA retaliation purposes, any determination the Court would make regarding vicarious liability post-verdict would be as to damages, i.e., who would incur any damages the jury awarded.

As a practical matter, vicarious liability has no bearing on the jury's determination on the exemption issue, because that turns on facts about Plaintiff's position and job duties, not any relationship between or actions taken by the Defendants. It would not be impacted by the jury favoring one Defendant over the other, as the verdict form makes clear that both Defendants bore

the burden of proof to establish Plaintiff was exempt, and the jury found Defendants had met this burden. On the subject of retaliation, Defendant Kundu testified he believed Plaintiff was working on a salary basis, that Defendant Trakru had authority to making hiring decisions, and that he ratified Defendant Trakru's decision to fire Plaintiff if Plaintiff was indeed terminated. Nonetheless, the jury's determination that Plaintiff did not engage in protected activity, the threshold question in her retaliation claim, also would not implicate the relationship between the Defendants. Moreover, within the context of the FLSA, and particularly in the context of this case where the decisionmaker was found to be an "employer" and a "person" as a matter of law, the only relevance of vicarious liability for any FLSA violation would be as to damages. Because the jury found no violation of the FLSA, vicarious liability essentially became moot. *See Kanida v. Gulf Coast Med. Pers. L.P.*, 363 F.3d 568, 579 (5th Cir. 2004) (noting that a vicarious liability jury instruction was unnecessary because "[t]his instruction did not concern a disputed issue at trial and the jury was adequately instructed on the law governing retaliation" and "nothing prevented [plaintiff] from highlighting [an employer's responsibility for the actions of its employees] in her argument to the jury."); *see also El-Hakem v. BJY Inc.*, 262 F. Supp. 2d 1139, 1151 (D. Or. 2003) (granting a motion for judgment as a matter of law to reflect that a jury award of damages was applicable to the defendant corporation as well as the individual defendant due to vicarious liability).

Plaintiff's theory appears to be that the jury's question shortly after beginning deliberations ("Are we ruling on Dr. Kundu & Miss Tracku [sic] separately?") indicates the jury was confused about the relationship of the parties and made their determination because they liked one Defendant and did not want to punish that Defendant although they disliked the other Defendant.

22

As stated above, however, both parties agreed vicarious liability could be determined by the Court post-verdict and, more importantly, the relationship between the Defendants and actions taken by the Defendants has little to no bearing on the determination that Plaintiff was exempt and that Plaintiff did not engage in protected activity. Plaintiff seems to be arguing that a vicarious liability instruction would have appreciably changed the outcome because it would have clarified the responsibilities of the Defendants. This, however, is pure speculation. Indeed, if Plaintiff's theory is correct and the jury favored one Defendant over the other and did not want to punish the one they favored, it is difficult to see how a vicarious liability instruction would cure any perceived problem with the jury's thought process, as an instruction would have clarified that both Defendants were responsible for any damages awarded. Therefore, the Court concludes the absence of a vicarious liability jury instruction is irrelevant given the jury's verdict; furthermore, it is nothing but speculation by Plaintiff that the inclusion of such an instruction would have altered the resulting verdict.

As to Plaintiff's alternative request for jury communication, E.D. Tenn. L.R. 48.1 states as follows:

> Unless permitted by the Court, no attorney, representative of an attorney, party or representative of a party, may interview, communicate with, or otherwise contact any juror or prospective juror before, during, or after the trial. Permission of the Court must be sought by an application made orally in open court or upon written motion stating the grounds and the purpose of the contact. If permission is granted, the scope of the contact and any limitations upon the contact will be prescribed by the Court prior to the contact.

While it is not true of all courts, it has long been the practice of this Court to discourage contact between attorneys and jurors, even after a verdict is reached, as reflected in the local rule. "District courts have 'wide discretion' to restrict contact with jurors to protect jurors from 'fishing

23

expeditions' by losing attorneys." *United States v. Wright*, 506 F.3d 1293, 1303 (10th Cir. 2007) (quoting *Journal Pub. Co. v. Mechem*, 801 F.2d 1233, 1236 (10th Cir. 1986)); *see also United States v. Logan*, 250 F.3d 350, 378 (6th Cir. 2001). When considering whether to allow a party to contact a juror post-trial, this Court considers the protection of jurors against harassment or embarrassment, the risk of future incidents of jury tampering, the finality of the trial, and the integrity of the judicial system. *See e.g., McDonald v. Pless*, 238 U.S. 264, 267-68 (1915); *Tanner v. United States*, 483 U.S. 107, 127 (1987); *United States v. Wettstain*, 618 F.3d 577, 590-91 (6th Cir. 2010) (stating "a juror is incompetent to impeach the verdict"). The underlying policy behind E.D. Tenn. L.R. 48.1 is akin to that of Federal Rule of Evidence 606(b), which limits the ability of a juror to testify "about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." Rule 606(b) further states "[t]he court may not receive a juror's affidavit or evidence of a juror's statement on these matters." As such, the Court does not want to "license[] litigants to attack verdicts based upon juror testimony." *United States v. Odunze*, 278 F. App'x 567, 573 (6th Cir. 2008); see also *United States v. Vassar*, 346 F. App'x 17, 22-23 (6th Cir. 2009).

Plaintiff's request for juror communication is largely moot given the Court's determination of the vicarious liability issue in the context of Plaintiff's motion for judgment as a matter of law or new trial; however, the Court notes that Plaintiff's theory that the jury's question indicated confusion and that a clarification on vicarious liability would have resulted in a different verdict is pure speculation. Given the guidance found in the Court's local rule, the Federal Rules of Evidence and applicable case law, the Court sees no valid reason to engage the jurors in

24

communication regarding the thought processes involved in reaching their verdict.

**IV.      CONCLUSION**

For the reasons outlined above, Plaintiff's motion for judgment as a matter of law or, in the

alternative, for a new trial or juror communication [Doc. 135] is **DENIED**.

SO ORDERED.

ENTER:

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE